O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE C. P.,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL, Deputy Commissioner of Operations, performing the duties and functions not reserved to the Commissioner of Social Security,<br><br>    Defendant. | Case No. 2:17-cv-05042-KES<br><br>MEMORANDUM OPINION AND ORDER |

**I.**

**BACKGROUND**

On November 15, 2013, Valerie C. P. ("Plaintiff") filed an application for disability insurance benefits ("DIB") alleging disability beginning June 12, 2012. Administrative Record ("AR") 135-37. On November 17, 2015, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). AR 35-61.

On January 21, 2016, the ALJ issued a decision denying Plaintiff's DIB application. AR 17-30. The ALJ found that Plaintiff suffered from the following medically determinable severe impairments: "status post-concussion; status post

mild traumatic brain injury (TBI); thyroid orbitopathy[1]; dizziness and headaches; cervical degenerative disc disease; and obesity." AR 20. Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work[2] with some additional limitations on postural activities and restrictions against work requiring driving, maintaining a fast pace, or "more than moderate exposure to noise." AR 23-24. Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could perform her past relevant work as an elementary school teacher, Dictionary of Occupational Titles ("DOT") 092.227-010. AR 29-30. The ALJ therefore concluded that Plaintiff was not disabled. AR 30.

## II.
## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir.

---

[1] This is an autoimmune inflammatory disorder that can lead to enlargement of muscles and fat around the eyes. See AR 469.

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday …. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms." Social Security Ruling ("SSR") 83-10.

2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

### III.
### ISSUE PRESENTED

Plaintiff's appeal presents the following four issues:

Issue One: Whether the ALJ properly evaluated the medical opinions of treating neurologist, Dr. Roger Bertoldi.

Issue Two: Whether the ALJ properly evaluated the medical opinions of treating physician, Dr. Robert Giombetti.

Issue Three: Whether the ALJ properly evaluated Plaintiff's subjective symptom testimony.

Issue Four: Whether the ALJ's assessment that Plaintiff is capable of "medium" work is supported by substantial evidence.

(Dkt. 20, Joint Stipulation ["JS"] at 3.)

# IV.
# DISCUSSION

A. **ISSUE ONE: Dr. Bertoldi.**

    **1. Summary of Claimed Error.**

The record contains treating records from Dr. Bertoldi (AR 528-93), which include a Neurological Evaluation Permanent and Stationary Report ("Report") dated July 1, 2015 (AR 537-51). Among other opinions, Dr. Bertoldi's Report contains the following two work restrictions:

> Due to Ms. [P.'s] cognitive deficits, she is restricted from complex decision making, occupations where the security of other would depend upon her vigilance and work that requires precision or attention to detail under distracting conditions [the "Mental Limitations Opinion"]. . . .
>
> Due to Ms. [P.'s] visual deficits, she is restricted from work that requires depth perception, work that requires fine motor manipulation, [and] work that requires double simultaneous stimulation [the "Visual Limitations Opinion"].

AR 550.

Plaintiff contends that the ALJ failed either to incorporate these restrictions into the assessed RFC or give a specific and legitimate reason for rejecting them. (JS at 4.)

    **2. The ALJ's Evaluation of Dr. Bertoldi's Opinions.**

The ALJ adopted many of Dr. Bertoldi's opinions in the assessed RFC and generally gave his opinions "great weight" because they were "supported by the records as a whole." AR 29. The ALJ, however, did not incorporate all of Dr. Bertoldi's opinions into the assessed RFC.

Regarding the Mental Limitations Opinion, the ALJ found that Plaintiff did not suffer from "severe affective or anxiety disorder, or any other mental disorder

except for limitations associated with a mild traumatic brain injury." AR 22. The ALJ declined to adopt Dr. Bertoldi's restriction against complex decision-making, because that restriction was inconsistent with his own findings and the record as a whole. AR 21-22. As examples of other inconsistent medical opinions, the ALJ cited (1) a neuropsychological exam by Dr. Levine that concluded Plaintiff was "not considered disabled from a cognitive standpoint but her diminished processing speed and problems with prolonged concentration hamper her activities of daily living from a cognitive standpoint"; (2) the findings of the consultative psychologist Dr. Campbell (who found that Plaintiff had no functional limitations caused by mental impairments); and (3) "a normal EEG [electroencephalogram] performed in July 2014." AR 21-22, citing AR 541-42, 446. The assessed RFC does restrict Plaintiff from working environments that would present certain kinds of distractions such as hazards, dangerous machinery, and noise. AR 24. The RFC does not restrict Plaintiff from work requiring complex decision-making or responsibility for the security of others. Id.

Regarding the Visual Limitations Opinion, the ALJ found that Plaintiff has "visual impairment consistent with thyroid orbitopathy," but that Plaintiff's visual impairments did not satisfy the Listings. AR 20, 22; see also AR 469 (consulting ophthalmologist opined that Plaintiff's eye troubles were consistent with thyroid disorder, not head trauma). The ALJ cited an eye exam showing that Plaintiff had 20/20 vision in both eyes with glasses. AR 22, citing AR 232. To account for some visual limitations, the ALJ restricted Plaintiff against work at night and work requiring depth perception. AR 24. The ALJ did not limit Plaintiff's fingering (i.e., fine motor manipulation). AR 20, 24. The work of an elementary school teacher, as described in the DOT, requires only occasional fingering that can be performed with a low degree of finger dexterity. See DOT 092.227-010.

### 3. Analysis of the ALJ's Evaluation.

#### a. The Mental Limitations Opinion.

The ALJ's reasons for rejecting Dr. Bertoldi's restriction against complex decision-making logically extend to his rejection of Dr. Bertoldi's restriction against work imposing responsibility for the security of others. The ALJ explained that Plaintiff did not have any mental impairments beyond those caused by mild TBI, and per the medical evidence, those mental impairments did not limit Plaintiff's ability to make decisions, including decisions related to others' security. AR 21-24.

Substantial evidence in the record supports the ALJ's reasoning. During the 2011-12 school year, Plaintiff taught at Carlthorp School, a private elementary school, as an assistant math specialist. AR 41, 334-35. In October 2011, she was hit in the face with a kicked rubber ball, after which she did not lose consciousness, but she was diagnosed with post-concussive syndrome. AR 99, 334-35, 442. She continued working the rest of the school year, taking extended lunch breaks and time off for medical appointments as needed. AR 50-53. She separated from Carlthorp School in June 2012 when they terminated her position. AR 41, 335.

During the 2012-2013 school year, she worked about 25 days as a substitute teacher at Saint Monica's Catholic Elementary School. AR 39-40, 210. In April 2013, Dr. Schorr noted that Plaintiff "continues to work part-time as a substitute teacher and may continue to do so." AR 237. Later in 2013, she successfully interviewed to be hired by Alpha Learning Center, a private tutoring center, as their director of education, but she did not complete the ten-day training because "[t]here were massive amounts of reading, and my eyes were bothering me." AR 40. In March 2014, Plaintiff told the consultative psychologist Dr. Campbell that she had not received care from a mental health professional. AR 442. She lived alone, managed her household, handled her own money, drove, exercised, and ran errands. AR 443. When asked in 2015 why she could not work, Plaintiff did not identify

6

functional limitations caused by mental impairments. AR 41.

This record supports the ALJ's determination that Plaintiff did not need to be restricted against work that placed others, such as children, in her care. Indeed, for months after her accident she continued to teach at Carlthorp School, and she worked part-time as a substitute teacher the next year.

### b. The Visual Limitations Opinion.

The ALJ explained why the medical evidence did not support limiting Plaintiff's use of her hands or imposing additional limitations due to eye impairments. AR 20, 22. Regarding the Visual Limitations Opinion, Plaintiff does not dispute that medical evidence shows her corrected vision as 20/20. AR 232. Other medical sources did not limit her fingering. See AR 267 (Dr. Giombetti), AR 72 (Dr. Chiang), AR 231 (Dr. Saeid), AR 471 (Dr. Yates [eye specialist assessed no work restrictions]). Substantial evidence therefore supports the ALJ's decision not to limit Plaintiff's fingering due to visual deficits.

## B. **ISSUE TWO: Dr. Giombetti.**

Dr. Robert Giombetti, a treating physician, submitted a Functional Abilities Evaluation form dated July 31, 2012, indicating that Plaintiff could only work four hours/day. AR 267. If she did work an eight-hour day, then she could spend four hours walking or sitting, but only one hour standing. Id. She could, however, also spend up to one hour each day kneeling, twisting, bending, climbing, pushing, pulling, lifting, and squatting. Id. He indicated that Plaintiff has "severe fatigue" and should be restricted against driving because she "does not drive when feeling tired." Id. He opined that five pounds was the "maximum" weight she could lift, although she could spend one hour every day lifting. Id. He did not impose any restrictions on grasping or fine manipulation. Id.

The ALJ rejected Dr. Giombetti's opinions as inconsistent with (1) his own treating records, (2) other medical evidence, including the opinions of consultative examiner Dr. Saeid and "other physicians," and (3) the record as a whole, including

Plaintiff's work history and post-accident activities. AR 28.

### 1. Reason One: Inconsistent with His Own Treating Notes.

Dr. Giombetti's treating notes are generally in the record at AR 244-310. His records include the following notes:

- 10/19/11: "Unremarkable CT brain without contrast." AR 309.
- 11/11/11: "States not doing well" and "panic attack on way to have MRI, very scary." AR 304. "States has slowness of speech, thought." Id. Dr. Giombetti requested a brain MRI. AR 302.
- 11/28/11: Dr. Giombetti wrote a letter excusing Plaintiff from credentialing coursework but anticipating she could resume it "mid February 2012." AR 292.
- 12/20/11: "States doing a little better; states less 'sleepy' overall. Past week-end felt 'normal' all day on Saturday." AR 291. "Insurance has finally approved physical therapy." Id.
- 2/22/12: "Feels much better." AR 284.
- 3/26/12: "Doing okay overall." AR 283. Dr. Giombetti wrote that Plaintiff had headaches every morning but takes Advil 3-4 times/week which "works well." Id. "Still c/o [complains of] neck pain, going to PT [physical therapy], does help." Id.
- 4/9/12: Dr. Giombetti wrote Plaintiff a new prescription for Elavil, a nerve pain medication and antidepressant. AR 282; see also AR 312 (stopped Elavil in June 2013).
- 4/30/12: "States not doing well c/o [complains of] severe fatigue … can barely get chores done." AR 280.
- 6/11/12: "Doing better"; "feels like consistently improving"; "states cont. to feel fatigued." AR 271.
- 7/10/12: "States not doing well"; "position at school has been terminated"; "States she is 'devastated' now has to try to get new job." AR 270. "States 'cries all the time'" and still complains of "severe fatigue." Id.

8

- 7/31/12: Dr. Giombetti completed a Functional Abilities Evaluation for the Carlthorp School's workers' compensation insurance carrier. AR 266-67. He opined that Plaintiff was not yet stable, but anticipated a stability and return-to-work date of October 1, 2012. AR 267.
- 9/24/12: "Feels better overall"; "recent eye exam, states prescribed prism glasses, seems to help when wearing but feels dizzy when takes glasses off." AR 264.
- 9/25/12: He expected Plaintiff could return to modified work as of November 1, 2012, and reach maximum medical improvement by December 1, 2012. AR 255. He noted that she had completed physical therapy and was doing therapeutic exercise at home. AR 256.
- 11/5/12: "Doing better . . . Doing course work for credentialing, almost finished." AR 246.
- 3/4/13: "States tried to work"; "worked 3 days last week, did okay while working but at the end of 3 days felt 'terrible.'" AR 244.

These records show that initially after the October 2011 accident, Plaintiff reported pain and other symptoms (AR 304) and by December 2011 was still reporting pain but had experienced a normal day (AR 291). During the rest of the 2011-2012 school year while she was still teaching, she once reported doing poorly but was still able to complete chores (AR 280) and over-the-counter pain medication was effective (AR 283). She reported she was doing better at least five times (AR 291, 284, 271, 264, 246) and she overall reported that she was "consistently improving" (AR 271).

When she learned her employer had terminated her position, she was "devastated." AR 270. Dr. Giombetti completed the Functional Abilities Evaluation in July 2012, immediately after Carlthorp School eliminated Plaintiff's position. AR 266-67. Instead of reporting improvement, he opined that her exertional capacity in July 2013 was far worse than the capacity she had

demonstrated in June 2013 while working at Carlthorp School. For example, Plaintiff described her work at Carlthorp School as frequently requiring her to lift ten pounds, walk or stand for eight hours, and stoop or bend for five hours. AR 166. Dr. Giombetti opined that she could only lift five pounds, stand for one hour, and bend for one hour. AR 267. Thus, his opinions in July 2013 were not consistent with his treating notes which documented improvement and never advised her to stop working at Carlthorp School.

### 2. Reason Two: Inconsistent with Other Medical Evidence.

Consultative examiner, Dr. Saeid, examined Plaintiff in January 2013. He noted no tenderness in her back, negative straight leg raising tests, and a range of motion "within normal limits." AR 230. He found her capable of lifting 50 pounds frequently and 100 pounds occasionally, as well as walking, standing, or sitting for six hours/day. AR 231. Due to Plaintiff's spinal impairments, the ALJ determined that medium work was a more appropriate RFC. AR 23.

State agency psychologist Dr. Foster-Valdez opined that Plaintiff's brain injury was not a "severe" impairment, citing "normal CTs and MRIs following reported head injury" and a report of a consultative psychologist who found Plaintiff "generally high functioning." AR 69. "Clmt, despite all of the evidence to the contrary, is convinced that she was seriously injured when hit by a rubber ball. … Objectively, clmt appears quite capable of returning to work." Id.

In February 2014, State agency medical doctor Dr. Chiang determined that Plaintiff was exaggerating the severity of her condition based on inconsistency with her activities of daily living. AR 70. Dr. Chiang opined that Plaintiff could do medium work (i.e., lift 25 pounds frequently and 50 pounds occasionally). AR 71. The ALJ gave Dr. Chiang's opinion "great weight" because it was consistent with "the records as a whole, including the claimant's admitted level of activities." AR 28.

In contrast, Dr. Giombetti opined that the "maximum weight" Plaintiff could

10

lift was only five pounds. AR 267. Even sedentary work requires the ability to lift up to ten pounds. 20 C.F.R. § 404.1567(a). Plaintiff herself "does not allege disability due to orthopedic problems." (JS at 28.) The ALJ did not err in discounting Dr. Giombetti's extreme opinion as inconsistent with the opinions of other doctors who either examined Plaintiff or reviewed her medical records.

### 3. Reason Three: Inconsistent with Plaintiff's Work and Activities.

The ALJ discussed several sources of evidence describing Plaintiff's daily activities. First, the ALJ noted, "claimant continued to exercise, ride her bike and attend courses in order to obtain teaching credential." AR 27, citing 246 (a 11/5/12 treating note by Dr. Giombetti that says, "Doing course work for credentialing, almost finished.") Plaintiff also "continued to work part-time as a substitute teacher." AR 27, citing AR 237 (a 4/9/13 evaluation by Dr. Shorr noting that Plaintiff "is obtaining her teaching credential" and "continues to work part-time as a substitute teacher"). In May 2014, Plaintiff admitted that she could climb up one flight of ten steps, stand, sit, recline, rise from a chair, run errands, shop, and get in and out of a car. AR 27, citing AR 584-85 (5/7/14 Bertoldi report); see also AR 337-38 (Dr. Shorr's 4/9/13 evaluation).

The ALJ also gave "considerable weight" to the Function Report completed by Plaintiff's friend, Claudia Brentwood. AR 29, citing AR 172-80. Per Ms. Brentwood, Plaintiff "lives alone and is able to care for her own personal needs, and takes care of her pet cat, prepares simple meals, performs household chores, leaves her home on a daily basis, drives a car and shops in stores … takes short walks, visits with friends on occasion, exercises and goes to the park." Id. Per Ms. Brentwood, she used to take long walks with Plaintiff 2-5 times/week, but after Plaintiff's accident they took shorter walks and sometimes Plaintiff declined to go for a walk due to fatigue. AR 172, 176.

First, Plaintiff argues that the ALJ incorrectly interpreted Dr. Giombetti's note, because she "completed her teaching credential in 1980." (JS at 21, citing AR

165 [form Plaintiff completed indicating that she received her credential in 1980 and started teaching in 1985].) Plaintiff, however, apparently told Dr. Giombetti she was taking classes towards her teaching credential in 2011, because on November 28, 2011, he wrote a letter excusing her from continuing "with course work related to credentialing," but he noted, "She is expected to be able to resume her course work mid February 2012." AR 292. She apparently did resume her studies, because in November 2012 and April 2013, she told Drs. Giombetti and Shorr, respectively, that she was taking classes towards her teaching credential. AR 237, 246. She also told Dr. Bertoldi that prior to the accident, she was working full time and "studying to complete her credentials." AR 579. She further reported that after the accident, the "following winter, [she] completed her studies …." Id. In March 2014, she told Dr. Campbell that she had a bachelor's degree and a teacher's credential. AR 443. Thus, the ALJ did not err in citing evidence of record that Plaintiff was taking courses to complete her teaching credential as an activity inconsistent with mental disability.

  Plaintiff next argues that taking these courses was not inconsistent with her claim to have been experiencing blurry vision, pain, and fatigue upon reading, because the short references to her taking courses do "not indicate the kind or amount of course work involved, how often she may have attended a class, or whether she continued to attend classes, or had stopped for a period of time following her injury." (JS at 21.) While it is true that Plaintiff did not provide transcripts or other academic records, the ALJ could nevertheless find that pursing any amount of college-level studies was inconsistent with Plaintiff's claims of visual and mental impairments that disabled her from working.

  Plaintiff also argues that working as a substitute after her accident was not inconsistent with Dr. Giombetti's opinion that she could only work 4 hours each day, because she only worked about 25 days during the 2012-2013 school year. (JS at 21.) The ability to work even 25 days as a fulltime substitute teacher, however,

is inconsistent with Dr. Giombetti's opinion that she can only work four hours/day. "The ability to perform part-time work is a factor the ALJ may consider in assessing credibility." Foster v. Astrue, No. EDCV 11-1077-OP, 2012 U.S. Dist. LEXIS 8859, at *30-31 (C.D. Cal. Jan. 23, 2012) (citing Bray v. Comm'r of SSA, 554 F.3d 1219, 1227 (9th Cir. 2009)).

Regarding her ability to climb up one flight of ten steps, run errands, shop, etc., Plaintiff argues that Dr. Bertoldi was reporting what she "said she could do before her injury." (JS at 22, citing AR 583.) While page AR 583 lists Plaintiff's reported activities "before the injury," page AR 582-83 also lists current (i.e., as of May 2014) daily activities, and AR 584-85 lists her activities "after the injury." Many of the listed activities are the same, emphasizing that her accident did not reduce her ability to perform many basic activities of daily living. Id.

Plaintiff argues that these activities are so basic that being able to do them is "not inconsistent with Plaintiff's testimony or with disability" as opined by Dr. Giombetti. (JS at 29.) While many are very basic (e.g., brushing teeth, sitting in a chair), others require higher mental functioning, such as writing a note, typing, using a computer, running errands, and shopping. AR 584. Plaintiff's ability to do these kinds of activities – many of which are the same as or like tasks performed by teachers – is inconsistent with her claim of mental disability. Other exertional activities – like opening a car door, carrying in groceries, cleaning a litter box, and doing laundry – are inconsistent with Dr. Giombetti's opinion that the most weight Plaintiff can push/pull/lift is five pounds.

Plaintiff challenges the ALJ for citing "riding a bicycle" as one of Plaintiff's activities, claiming that this is something "which Plaintiff does not do, and for which there is no support in the record." (JS at 29.) In January and May 2012, Plaintiff told her physical therapists that her activities included riding bicycles. AR 274, 289. In April 2013, Plaintiff told Dr. Shorr that she had difficulty engaging in "hobbies, such as biking and playing the flute." AR 338. On July 30, 2013,

13

Plaintiff reported, "Did some biking and exercise Sat. and did not feel well after, but Monday she felt the best she has felt in a long time." AR 436. The ALJ, therefore, did not err in citing bike riding as one of Plaintiff's post-accident activities.

C. **ISSUE THREE: Plaintiff's Subjective Symptom Testimony.**

The ALJ did not doubt the existence of Plaintiff's head and back conditions (AR 20); rather, the ALJ found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." AR 24. The ALJ discounted Plaintiff's subjective testimony of suffering disabling "headaches, dizziness, and blurred vision" as (1) unsupported by or conflicting with objective medical evidence and (2) inconsistent with her reported activities. AR 24-25, 27. The activities cited are the same activities discussed above as inconsistent with Dr. Giombetti's Functional Abilities Evaluation.

Plaintiff argues that the ALJ focused on pain, whereas her disabling, subjective symptoms involve eye trouble and vertigo. (JS at 28.) The ALJ specifically discussed how the ophthalmic examination and report of Dr. Yates yielded "normal findings" and, "In all reports, the claimant had 20/20 vision with correction." AR 27-28. The conflict between this medical evidence and Plaintiff's complaint of vision trouble is a clear and convincing reason to discount Plaintiff's testimony.

Plaintiff argues that the ALJ should have been more specific in explaining how Plaintiff's activities are inconsistent with dizziness and blurred vision. (JS at 28.) The record is clear that the ALJ found activities such as bike riding and continuing to work as a teacher inconsistent with disabling dizziness, and reading-intensive activities such as pursing credentialing coursework and teaching inconsistent with disabling vision problems. AR 27.

D. **ISSUE FOUR: RFC for Medium Work.**

Plaintiff argues that "the ALJ assessed an RFC for medium work. However,

14

no physician who saw, treated or examined [Plaintiff] made such an assessment." (JS at 30.) Plaintiff is referencing the fact that the consultative examiner, Dr. Saeid, opined that Plaintiff could do *more* than medium work, and the ALJ ultimately assessed an RFC more like the opinions of Dr. Chiang, a doctor who never examined Plaintiff. See AR 231, 71.

The opinions of a state agency reviewing physician, however, can constitute substantial evidence supporting an RFC determination contrary to the opinions of a treating or examining physician. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that opinions of nontreating or nonexamining doctors may serve as substantial evidence when consistent with independent clinical findings or other evidence in record). Moreover, the ALJ can consider the non-medical evidence of record, such as the claimant's reported activities and work history, when determining how much weight to give conflicting medical opinions.

Plaintiff contends that the ALJ must have impermissibly "made medical inferences of her own" because the ALJ "silently rejected" the "critical portions" of Dr. Bertoldi's Report, and that Report post-dates Dr. Chiang's opinion. (JS at 33-34.) As discussed above, the ALJ explained her reasons for accepting some of Dr. Bertoldi's opinions while rejecting others, and those reasons are supported by substantial evidence.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: June 22, 2018

/s/ Karen E. Scott
KAREN E. SCOTT
United States Magistrate Judge

15